**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF MISSOURI**
**EASTERN DIVISION**

| | | |
|---|---|---|
| **MARSHALL JACKSON,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| **vs.** | ) | **Case No. 4:10CV 1221 RWS(LMB)** |
| | ) | |
| **MICHAEL J. ASTRUE,** | ) | |
| **Commissioner of Social Security,** | ) | |
| | ) | |
| **Defendant.** | ) | |

**REPORT AND RECOMMENDATION**
**OF UNITED STATES MAGISTRATE JUDGE**

This is an action under 42 U.S.C. § 405(g) for judicial review of defendant's final decision

denying the application of Marshall Jackson for Disability Insurance Benefits under Title II of the

Social Security Act and Supplemental Security Income under Title XVI of the Act.  The cause

was referred to the undersigned United States Magistrate Judge for a Report and

Recommendation pursuant to 28 U.S.C. § 636 (b).  Plaintiff has filed a Brief in Support of the

Complaint.  (Document Number 17).  Defendant has filed a Brief in Support of the Answer.

(Doc. No. 25).  Plaintiff has filed a Reply.  (Doc. No. 26).

**Procedural History**

On February 21, 2006, plaintiff filed his application for benefits, claiming that he became

unable to work due to his disabling condition on November 15, 2004.  (Tr. 165-69).  This claim

was denied initially, and following an administrative hearing, plaintiff's claim was denied in a

written opinion by an Administrative Law Judge (ALJ), dated February 27, 2008.  (Tr. 82-83,

116-20, 14-20).  Plaintiff then filed a request for review of the ALJ's decision with the Appeals

Council of the Social Security Administration (SSA), which was denied on May 13, 2010.     (Tr.

6, 2-5).  Thus, the decision of the ALJ stands as the final decision of the Commissioner.  See 20

C.F.R. §§ 404.981, 416.1481.

## Evidence Before the ALJ

### A.    ALJ Hearing

Plaintiff's administrative hearing was held on December 7, 2007.  (Tr. 26).  Plaintiff was

present and was represented by counsel.  (Id.).  Also present was vocational expert J. Steven

Dolan.  (Id.).

Plaintiff's attorney stated that plaintiff was constructively requesting that the ALJ reopen a

prior application by alleging a disability onset date of November 15, 2004.  (Tr. 27).  Plaintiff's

attorney noted that plaintiff's previous application was dismissed after the initial decision because

plaintiff's diagnosis at the time was unspecified.  (Tr. 28).  He stated that plaintiff withdrew his

application and filed again after he was diagnosed with fibromyalgia.[1]  (Id.).  Plaintiff's attorney

stated that plaintiff believes that the diagnosis of fibromyalgia relates back to the earlier

application.  (Id.).

The ALJ noted that he did not see a definite diagnosis of fibromyalgia in the medical

record.  (Tr. 30).  Plaintiff's attorney stated that plaintiff was diagnosed with fibromyalgia through

a process of elimination.  (Id.).  The ALJ noted that he did not see any record of plaintiff's trigger

---

[1]A common syndrome of chronic widespread soft-tissue pain accompanied by weakness,
fatigue, and sleep disturbances; the cause is unknown.  The American college of Rheumatology
has established diagnostic criteria that include pain on both sides of the body, both above and
below the waist as well as in an axial distribution.  Additionally, point tenderness must be found in
at least 11 of 18 specified sites.  Stedman's Medical Dictionary, 725 (28th Ed. 2006).

points or any other support for a diagnosis of fibromyalgia. (Id.). Plaintiff's attorney indicated that he would contact plaintiff's doctor in an attempt to obtain this information. (Tr. 32).

Plaintiff's attorney then examined plaintiff, who testified that he was thirty-four years of age and lived with his wife. (Tr. 34). Plaintiff stated that he was six-feet, one-inch tall and weighed approximately 160 pounds. (Id.). Plaintiff testified that his wife worked and that his father helped them out financially. (Id.).

Plaintiff stated that he had health insurance through his wife's employer. (Tr. 35). Plaintiff testified that his wife worked as a caseworker for Missouri Division of Family Services. (Tr. 35). Plaintiff stated that he also received Medicaid benefits due to disability. (Id.).

Plaintiff testified that he was four classes away from receiving a master's degree in divinity. (Id.). Plaintiff stated that he had an undergraduate degree in psychology, with a minor in special education. (Id.). Plaintiff testified that he attended Covenant Theological Seminary in St. Louis, which is a Presbyterian seminary. (Tr. 36). Plaintiff stated that, when he became ill and was no longer able to attend classes, the school allowed him to take classes from home by listening to lectures on CDs. (Id.).

Plaintiff testified that he was never licensed in psychology or in special education. (Id.). Plaintiff stated that from 2000 to 2001, he received informal training from an individual as a crisis intervention specialist. (Tr. 37). Plaintiff testified that he did not receive a certificate or license as a result of this training. (Id.).

Plaintiff stated that at his last position, he worked for Reach Our Children verifying checks, working with children who had cancer, fund-raising, and doing campus ministry. (Id.). Plaintiff testified that he worked for this organization while he was attending Covenant

Theological Seminary and that the position ended in October of 2004. (Tr. 38). Plaintiff stated that he worked at this position for two or three years. (Id.).

Plaintiff testified that he worked at St. Louis Crisis Nursery for about four years. (Id.). Plaintiff stated that, at this position, he took care of children ranging in age from two weeks to thirteen years who were abused or homeless. (Id.). Plaintiff testified that he also worked a hotline, where he counseled parents or other adults who were fearful that they would abuse children. (Id.). Plaintiff stated that he also helped parents find housing or resources for jobs and provided anger management counseling for the children. (Id.). Plaintiff testified that he worked at this position part-time during the school year and full-time during the summer. (Id.).

Plaintiff stated that he worked at Council of Mid-South Presbyterian in Memphis as a youth leader for a couple months. (Tr. 39).

Plaintiff testified that he worked as a manager for Clay Pot, a florist, when he was an undergraduate student. (Id.). Plaintiff stated that at this position, he kept the books, chose flowers, created floral arrangements, took orders, and delivered flowers. (Id.). Plaintiff testified that he worked at this position for a summer, or about four months. (Tr. 40).

Plaintiff stated that he worked at Wolf Branch Nurseries, a plant nursery in Tennessee, doing landscaping. (Id.).

Plaintiff testified that he worked for Pioneer Title Agency in 1995 "condensing files" for an attorney. (Tr. 41). Plaintiff stated that he would photocopy a few pages from each file and the remainder of the file was sent to a warehouse. (Id.).

Plaintiff testified that he worked for Innovative Marketing Solutions, a for-profit company that was started to raise funds for a non-profit company. (Tr. 42). Plaintiff stated that, at this

position, he sat at a computer and took images of checks and compared the image with the actual check and verified the numbers. (Tr. 42-43). Plaintiff testified that he also spoke with groups of people to raise money for the charity. (Id.).

Plaintiff testified that he has also worked recruiting medical personnel for prisons by telephone. (Id.).

Plaintiff stated that he is not an ordained minister. (Tr. 44). Plaintiff testified that, when he worked as a youth minister, he was a youth director and worked under a pastor. (Tr. 44). Plaintiff stated that he planned to become ordained after he obtained his master's degree. (Id.).

Plaintiff testified that he worked as a job coach for a disabled person when he was in high school. (Id.). Plaintiff stated that he worked in a factory setting making car locks with mentally retarded individuals. (Id.).

Plaintiff testified that he worked for a water bottling company filling bottles, stacking pallets, and loading trucks. (Id.). Plaintiff estimated that he lifted about fifty pounds at this position. (Tr. 45).

Plaintiff testified that he did not believe that he could work full-time at the time of the hearing due to pain, fatigue, and mental confusion. (Id.). Plaintiff stated that he began experiencing these symptoms in October of 2004. (Id.). Plaintiff testified that he left his last job at Innovative Marketing Research and Reach Our Children due to these symptoms. (Tr. 46). Plaintiff stated that he was placed on a medical leave of absence and was not able to return to work so he was terminated. (Id.).

Plaintiff testified that he experiences pain from his hips down to his feet, including his hips, thighs, calves, knees, behinds his knees, and underneath his feet. (Id.). Plaintiff stated that he

also experiences some pain in his back and in his arms. (Id.). Plaintiff testified that this pain is constant, although it varies in degree. (Id.). Plaintiff stated that his pain does not follow a consistent pattern so it is not predictable. (Id.). Plaintiff testified that his pain increases when he over exerts himself physically. (Tr. 47).

Plaintiff stated that he participated in physical therapy, which helped somewhat. (Id.). Plaintiff testified that his physical therapist taught him how to do exercises and that he continues to do these exercises. (Id.). Plaintiff stated that his goal is to be able to walk around inside of a pool by summer. (Id.). Plaintiff testified that walking around a pool at the time of the hearing was too physically exerting. (Id.).

Plaintiff stated that he takes Cymbalta,[2] an antidepressant, to help control his pain. (Id.). Plaintiff testified that the Cymbalta helps him sleep. (Tr. 48). Plaintiff stated that one of the symptoms of fibromyalgia is an inability to enter REM sleep. (Id.). Plaintiff testified that a sleep study revealed he wakes up 70 to 80 times an hour. (Id.). Plaintiff stated that the Cymbalta helps him sleep better which, in turn, helps decrease his pain. (Id.). Plaintiff testified that a hot shower or bath also helps decrease his pain. (Id.).

Plaintiff's attorney noted that plaintiff was using a cane during the hearing. (Id.). Plaintiff testified that he uses a cane any time he travels outside his home. (Id.). Plaintiff stated that he tries not to use the cane when he is inside his home. (Id.). Plaintiff testified that all of his doctors have strongly encouraged him to use a cane. (Id.). Plaintiff stated that he resisted using the cane but his doctors advised him he would have to use it after he underwent a muscle biopsy. (Id.).

---

[2]Cymbalta is indicated for the treatment of major depressive disorder, generalized anxiety disorder, diabetic peripheral neuropathic pain, and fibromyalgia. See Physician's Desk Reference (PDR), 1801 (59th Ed. 2005).

Plaintiff testified that the doctors who advised him to use the cane were his neurologist, Dr. Shue; and his primary care physician, Dr. Michael Bavlsik. (Tr. 49). Plaintiff stated that his physicians did not actually prescribe a cane but just encouraged him to get one. (Id.). Plaintiff testified that he bought a cane at a medical supply shop. (Id.). Plaintiff stated that using the cane extends his energy by about fifty percent and steadies him when he is dizzy. (Id.).

Plaintiff testified that he experiences constant fatigue. (Id.). Plaintiff stated that he typically takes a one to four-hour nap every day around 11:00 or 12:00. (Tr. 50). Plaintiff testified that he tries to keep a consistent sleep schedule. (Id.). Plaintiff stated that he goes to bed around 11:00 p.m. and wakes up around 7:30 a.m. (Id.). Plaintiff testified that it takes him a while to fall asleep and he usually starts waking up about 5:00 a.m. (Id.). Plaintiff stated that he naps and stretches his legs to minimize his pain from around 5:00 a.m. until he rises at 7:30 a.m. (Id.).

Plaintiff testified that he naps and limits his physical activity to decrease his fatigue. (Id.). Plaintiff stated that it is difficult to read because he is unable to comprehend. (Id.). Plaintiff testified that he is only able to read for five to ten minutes at a time. (Id.). Plaintiff stated that it takes very little physical activity to wear him out. (Tr. 51). Plaintiff testified that activities such as taking a shower or shaving cause him to feel fatigued. (Id.). Plaintiff stated that making dinner for his wife is a "major activity." (Id.). Plaintiff testified that it is very difficult for him to clean the house. (Id.). Plaintiff stated that he tries to clean in short periods but it is very exhausting. (Id.).

Plaintiff testified that, after he wakes from his afternoon nap, it takes him about two hours to really wake up and be mentally alert. (Id.). Plaintiff stated that he sits and watches the news or

tries to do something else productive during this two-hour period.  (Id.).

Plaintiff testified that he watches some television and he enjoys watching movies.  (Id.).
Plaintiff stated that if he is having a bad day and is unable to do anything, he watches a movie.
(Tr. 52).

Plaintiff testified that he experiences mental confusion.  (Id.).  Plaintiff stated that his
mental confusion has slowed down the speed at which he is able to do normal activities, such as
getting dressed and reading.  (Id.).  Plaintiff testified that he must think through the process of
getting dressed because he tends to "zone out" during the process.  (Id.).  Plaintiff stated that he
reads extraordinarily slowly now.  (Id.).  Plaintiff testified that it takes him a couple of months to
read a book.  (Id.).  Plaintiff stated that it is difficult for him to write or express his thoughts.
(Id.).  Plaintiff testified that it recently took him four days to write a letter and when he was
finished, his wife had to make extensive corrections.  (Tr. 53).

Plaintiff stated that his fibromyalgia also causes random spells of vomiting or diarrhea and
lack of stamina.  (Id.).  Plaintiff testified that he tries to do laundry but he has only done it once in
five months.  (Id.).

Plaintiff stated that he is regularly involved with his church.  (Id.).  Plaintiff testified that
he attends church on Sunday morning and meets with a church group a block from his home on
Wednesday evenings.  (Tr. 54).  Plaintiff stated that he does not go to the Wednesday meeting if
he is having a bad day.  (Id.).

Plaintiff testified that he has a group of close friends that he sees regularly.  (Id.).  Plaintiff
stated that he usually sees at least one of them once a week.  (Id.).  Plaintiff testified that someone
will typically stop by his home to visit for about thirty minutes.  (Id.).  Plaintiff stated that the past

weekend one of his friends came to his home to help him and his wife decorate their Christmas tree. (Id.). Plaintiff testified that his friends have helped him with meals and with cleaning his house. (Id.).

Plaintiff stated that he experiences difficulty engaging in conversation. (Id.). Plaintiff testified that he experiences clear moments and confusing moments. (Id.). Plaintiff stated that he was having difficulty with confusion during the hearing. (Id.). Plaintiff testified that he has done extensive pastoral counseling and was an elder with his church but he is no longer able to do this due to the confusion. (Tr. 55).

Plaintiff stated that he is not able to participate in physical activities. (Id.). Plaintiff testified that he walks in the evenings with his wife but is only able to walk about two blocks. (Id.). Plaintiff stated that he used to enjoy photography, hiking, backpacking, camping, and rowing but is no longer able to participate in these activities. (Id.). Plaintiff testified that he has not done any of these activities since 2004. (Id.). Plaintiff stated that he went on a two-night camping trip with a church group at Carlyle Lake in Illinois on one occasion. (Id.). Plaintiff testified that it took a week to recover from this trip. (Id.).

Plaintiff stated that he does not drive often due to the pain and fatigue. (Tr. 56). Plaintiff testified that either his wife or a friend drives him about ninety-five percent of the time. (Id.).

The ALJ then examined plaintiff, who testified that his main doctor is Michael Bavlsik, an assistant professor at Washington University Medical School. (Id.). Plaintiff stated that he sees Dr. Bavlsik about every six months. (Id.). Plaintiff testified that he last saw Dr. Bavlsik about one month prior to the hearing. (Id.). Plaintiff stated that he used to see Dr. Bavlsik weekly, but stopped seeing him at this frequency about a year-and-a-half prior to the hearing. (Id.).

Plaintiff testified that he grew up in Greenville, Tennessee. (Tr. 57).

Plaintiff stated that he weighed 160 pounds at the time of the hearing and that he recently gained weight. (Id.). Plaintiff testified that his weight fell down to 130 pounds when he became sick. (Id.).

Plaintiff stated that he began experiencing flu-like symptoms intermittently in October of 2004 and was exhausted. (Id.). Plaintiff testified that he was working with college students in an office environment at the time. (Id.).

Plaintiff stated that he has not been hospitalized overnight. (Id.).

Plaintiff testified that he moved to St. Louis from Memphis in 2000. (Tr. 58). Plaintiff stated that he came to St. Louis to attend Covenant Theological Seminary. (Id.).

Plaintiff testified that he dated his wife for about a year before they married. (Id.). Plaintiff stated that he met his wife through his roommate at the time. (Id.). Plaintiff testified that when he was dating his wife, they went to coffee shops, went to the movies occasionally, and went to dinner. (Id.). Plaintiff stated that his wife drove him to the hearing. (Id.).

Plaintiff testified that he moved into his current residence one month before he married his wife. (Tr. 59). Plaintiff stated that family members and friends helped him pack and move. (Id.).

Plaintiff testified that he wears glasses. (Id.).

Plaintiff stated that he is able to stand for ten to fifteen minutes. (Id.). Plaintiff testified that he is able to sit comfortably without fidgeting for five to ten minutes. (Id.). The ALJ pointed out that plaintiff had been sitting for longer than that during the hearing. (Id.). Plaintiff stated that his buttocks and the back of his thighs hurt. (Id.). Plaintiff testified that he props his feet and changes positions frequently when he sits at home. (Id.). Plaintiff stated that he changes

positions from one side to the other due to pressure around his thighs and hips about every three to four minutes. (Tr. 60). Plaintiff testified that he is able to bend over. (Id.). Plaintiff stated that he is able to walk about one block without his cane. (Id.). Plaintiff testified that if he tries to walk farther than this, he experiences pain in his hips, thighs, calves, feet, lower back, and behind his knees. (Id.). Plaintiff stated that he is able to squat or stoop one time but not repeatedly. (Id.). Plaintiff testified that he would be able to squat or stoop one time every hour, although it would be exhausting at the end of the day. (Id.). Plaintiff stated that he is able to lift a gallon of milk and carry it from the car into the house, a distance of about ten feet. (Id.). Plaintiff testified that he would be able to do this once or twice during a day but not on a consistent basis. (Tr. 61). Plaintiff stated that he is able to lift a basket of laundry weighing about ten pounds once or twice but not on a consistent basis. (Id.).

Plaintiff testified that is able to read, write, and drive. (Id.). Plaintiff stated that he no longer has duties at his church. (Id.). Plaintiff testified that his church is close to his home and that he chose his home based on its proximity to church. (Id.).

Plaintiff stated that he wakes up by 7:30 a.m., and gets his wife's lunch ready. (Id.). Plaintiff testified that after his wife goes to work, he collapses on the couch and listens to the news online. (Tr. 62). Plaintiff stated that at around 10:00 or 10:30 a.m., he cooks breakfast. (Id.). Plaintiff testified that he starts getting tired around 11:00 a.m., and lies down to take a nap. (Id.). Plaintiff stated that he tries to straighten up the living room if he has energy. (Id.).

Plaintiff testified that he would rate his typical pain as a six or seven on a scale of zero to ten. (Id.). Plaintiff stated that his pain occasionally deceases to a five and increases to a ten. (Id.). Plaintiff testified that he no longer goes to the emergency room when he experiences severe

pain because there is nothing they can do. (<u>Id.</u>). Plaintiff stated that when he first became sick, he went to the emergency room but he learned that it did not help. (<u>Id.</u>).

Plaintiff testified that he was not seeing a psychiatrist or psychologist at the time of the hearing, although he has in the past. (Tr. 63). Plaintiff stated that he meets with his pastor regularly. (<u>Id.</u>). Plaintiff testified that he has close friends at his church who are counselors and they come over and check on him. (<u>Id.</u>).

Plaintiff stated that he tries to do his exercises every morning or every other morning although he is not always successful. (<u>Id.</u>). Plaintiff testified that he is getting better. (<u>Id.</u>). Plaintiff stated that his wedding really wore him out. (<u>Id.</u>). Plaintiff testified that he is not as confused as he was four months prior to the hearing. (<u>Id.</u>). Plaintiff stated that Dr. Bavlsik told him that taking vitamins, antidepressants and not overdoing it have been proven methods of treating fibromyalgia. (<u>Id.</u>).

Plaintiff testified that the only prescription medication he takes is Cymbalta. (<u>Id.</u>). Plaintiff stated that prescription pain medication makes him feel "drunk" or "stoned." (Tr. 64). Plaintiff testified that he takes over-the-counter ibuprofen in dosages of 600-800 milligrams, but it does not provide significant relief so he does not take it often. (<u>Id.</u>). Plaintiff stated that he only takes ibuprofen about once a week. (<u>Id.</u>).

Plaintiff testified that getting up and walking around occasionally helps relieve his leg pain if he has been sitting for a long period. (<u>Id.</u>). Plaintiff stated that sitting down helps his pain if he has been standing for a long time. (<u>Id.</u>). Plaintiff testified that the pressure from the sheets and blankets hurts his legs at night and that he occasionally gets up and walks around for a minute to help relieve the pain. (Tr. 65).

Plaintiff stated that he has not worked at all since November 15, 2004. (Id.). Plaintiff testified that he is unable to consistently come to work or stay at a job for any length of time if he comes to work. (Id.).

Plaintiff testified that his Sunday church service lasts about one hour. (Id.). Plaintiff stated that he stays seated while the congregation stands up and sits down. (Id.). Plaintiff testified that the congregation stands in a circle during communion, while he stays seated because he is unable to stand that long. (Id.). Plaintiff stated that this is the only activity in which he engages on Sundays. (Id.). Plaintiff testified that he does not engage in any physical activity on Mondays. (Id.).

The ALJ then examined the vocational expert, John Steven Dolan, who testified that plaintiff has skills that are transferable to performance of other types of work. (Tr. 67). Mr. Dolan stated that plaintiff has oral and written communication skills, computer skills, clerical skills, record-keeping skills, counseling skills, and case recording skills. (Id.). Mr. Dolan testified that some of plaintiff's jobs have been at a skill level of six and some have been at a level seven. (Id.). Mr. Dolan stated that plaintiff's past jobs have ranged from unskilled to skilled and from sedentary to medium. (Tr. 68),

The ALJ asked Mr. Dolan to assume an individual plaintiff's age and work history, with a college degree and almost a master's degree who has been diagnosed with possible fibromyalgia and was limited as found by Dr. Virgil Das. (Tr. 70). Mr. Dolan testified that such an individual would not be able to perform any jobs that would exist in significant numbers locally or nationally. (Tr. 71). Mr. Dolan stated that the restrictions of fatigue after fifteen minutes of activity and needing a break every five minutes for thirty minutes would preclude gainful employment. (Id.).

The ALJ next asked Mr. Dolan to assume a hypothetical individual with plaintiff's background and diagnoses and the following limitations: able to lift ounces to ten pounds maximum; able to sit and stand alternately throughout the workday, six out of eight hours, with appropriate rest breaks; able to perform at least simple one-two-step operations; able to sit for half an hour at a time or stand ten to fifteen minutes at a time but would have to change positions. (Id.). Mr. Dolan asked the ALJ to clarify the individual's cognitive ability. (Id.). The ALJ stated that the individual would be capable of performing simple one-two-step instructions, however is able to understand complex and multiple procedures. (Id.). The ALJ stated that, when the individual gets fatigued, it is difficult for him to sustain that type of mental energy. (Id.). The ALJ stated that the individual would therefore be capable of performing a little more than simple routine operations in possibly the next level up on a sustained basis but not the more complex type on a sustained basis. (Tr. 72-73).

Mr. Dolan testified that there would be jobs that such an individual could perform. (Tr. 73). Mr. Dolan stated that the individual could perform skilled jobs such as receptionist (15,000 locally) and telemarketer (7,300 locally); and unskilled jobs such as cashiers in some settings (2,000 locally), food and beverage order clerk (700 locally), and security guard (3,000 locally). (Id.). Mr. Dolan testified that the individual would not be capable of performing counseling jobs because they would be much too complex. (Id.). Mr. Dolan stated that none of these jobs would require the individual to have concentrated exposure to heights or dangerous machinery if he should become dizzy. (Tr. 74).

Mr. Dolan testified that an additional restriction of using a cane to walk over one block would severely reduce the number of unarmed security guards and would almost eliminate this

position.  (Id.).

Plaintiff's attorney then examined Mr. Dolan, who testified that a restriction of requiring a one-hour break or more on a daily basis in the early afternoon or late morning would affect the ability to work in a competitive workplace.  (Tr. 75).  Mr. Dolan stated that the individual would not be able to find a significant number of jobs in any given occupation.  (Id.).

The ALJ indicated that he would leave the record open for two weeks so that plaintiff could submit additional evidence.  (Tr. 76).


**B.      Relevant Medical Records**

The record reveals that plaintiff presented to People's Health Centers on November 15, 2004, with complaints of feeling tired all the time for the past four to five months.  (Tr. 303).  Samuel Joseph, PA-C diagnosed plaintiff with chronic fatigue.  (Tr. 304).

Plaintiff saw Lloyd V. Das, M.D. at Mercy Family Medicine on November 29, 2004, to get established with the practice.  (Tr. 321-24).  Plaintiff complained of fatigue that began six months prior.  (Tr. 321).  Plaintiff also reported increased difficulty making decisions, loss of energy, insomnia with early morning awakening, feeling stressed intermittently, muscle cramps, muscular pain, and back pain. (Tr. 321-22).  A physical examination revealed no abnormalities.  (Tr. 322-23). Dr. Das' assessment was fatigue and restless legs syndrome.[3] (Tr. 324).  He prescribed Clonazepam.[4]

---

[3]A sense of indescribable uneasiness, twitching, or restlessness that occurs in the legs after going to bed, frequently leading to insomnia, which may be relieved temporarily by walking about. Stedman's at 1911.

[4]Clonazepam is indicated for the treatment of seizure disorders and panic disorder.  See PDR at 2639.

(Id.).

In a letter to Dr. Das dated December 23, 2004, Ling Xu, M.D. indicated that plaintiff reported multiple sensory complaints, including feeling a constant lack of energy, feeling fever without too high temperatures, dizziness due to balance difficulty, body aches, difficulty focusing mentally and visually, difficulty in thought process, excessive daytime sleepiness, and some weakness. (Tr. 330). Dr. Xu noted that plaintiff's mother had a history of mitochondrial myopathy[5] and history of myalgia.[6] (Id.). Dr. Xu's impression was subjective complaints of severe fatigue and diffuse muscle aching, etiology to be determined to rule out myopathy and neuromuscular junction[7] disorder. (Tr. 331). Dr. Xu indicated that plaintiff would be referred for EMG and nerve conduction study and possible repetitive nerve stimulation. (Id.).

Plaintiff underwent electromyography and nerve conduction studies on January 19, 2005, which were normal and revealed no evidence of peripheral neuropathy,[8] myopathy or neuromuscular transmission disorders. (Tr. 338).

Plaintiff saw Dr. Das on January 31, 2005, at which time he reported that his malaise and fatigue had worsened. (Tr. 319). Dr. Das noted that a sleep study was pending. (Id.).

In a letter to Dr. Xu dated February 8, 2005, Jaime A. Boero, M.D., PhD. noted that plaintiff

---

[5]Weakness and hypotonia of muscles, primarily those of the neck, shoulder, and pelvic girdles, with onset in infancy or childhood; on biopsy, giant bizarre mitochondria are seen located between muscle fibrils. Stedman's at 1274.

[6]Muscular pain. Stedman's at 1265.

[7]The connection of the axon of the motor neuron with a muscle fiber. See Stedman's at 1018.

[8]Disorder of the peripheral nerves, which are the nerves that carry information to and from the brain. See Stedman's at 1312.

complained of chronic fatigue, sinus congestion, back pain, and muscle aches. (Tr. 646-47). Dr. Boero found no evidence of systemic processes. (Tr. 648). He indicated that plaintiff agreed to return for an overnight sleep study. (Id.). Dr. Boero stated that plaintiff reported insomnia for many years and that he suspected that the insomnia may be an important factor contributing to his current symptoms. (Id.).

Plaintiff underwent an all night sleep study February 15, 2005. (Tr. 308). Dr. Boero stated that sleep latency tests revealed a mean sleep latency[9] of four minutes, which was within the "severely pathological range." (Id.). Dr. Boero stated that these results were consistent with plaintiff's non-cardiac insomnia with frequent fragmentation of his sleep. (Id.). Dr. Boero indicated that he advised plaintiff to start exercising, including swimming and walking. (Tr. 309). He prescribed Elavil[10] for plaintiff's chronic pain. (Id.).

Plaintiff saw Dr. Das on March 15, 2005, at which time he reported that his malaise and fatigue had not changed and his energy levels had declined. (Tr. 317). Plaintiff indicated that he had finished his finals at the seminary. (Id.). Dr. Das noted that not all the trigger points for fibromyalgia had been noted. (Id.). Upon physical examination, trigger points were noted in plaintiff's neck and lower back only. (Id.). Dr. Das' assessment was fatigue, "probably a myofascial pain syndrome like fibromyalgia." (Id.).

Dr. Xu completed a medical source statement on March 30, 2005, in which he noted that

---

[9]The multiple sleep latency test measures how long it takes a person to fall asleep during the day. See WebMD, http://www.webmd.com/sleep-disorders/guide/diagnosing-narcolepsy (last visited July 13, 2011).

[10]Elavil is an antidepressant indicated for the treatment of depression. It is also prescribed to treat nerve pain. See WebMD, http://www.webmd.com/drugs (last visited July 13, 2011).

plaintiff's gait with and without assistive device was normal and his neurologic examination was "completely normal." (Tr. 329). Dr. Xu listed plaintiff's diagnosis as: subjective complaints without objective abnormal findings; no evidence of myopathy, neuropathy, metabolic or neuromuscular transmission disorder. (Id.).

In a letter to Dr. Das dated May 19, 2005, Dr. Xu indicated that plaintiff had applied for disability "though neurologically, extensive neuromuscular workup showed no evidence of myopathies or neuromuscular junctional disorder or neuropathies to explain his subjective complaint of pain and weakness." (Tr. 415). Dr. Xu noted that the medication prescribed by Dr. Das provided some pain relief, although plaintiff complained of crying episodes. (Id.). Dr. Xu stated that plaintiff's subjective complaints are fatigue, possibly related to a chronic sleep deprivation; and possible depression associated with some excessive daytime drowsiness and lethargy. (Id.). Dr. Xu indicated that fibromyalgia was a possible diagnosis although he noted psychiatric features as well as "possibly secondary gain from seeking disability is a component of it." (Id.). Dr. Xu recommended a muscle biopsy, a referral to a sleep clinic, a psychiatric evaluation, and more physical exercise. (Tr. 416).

Plaintiff saw Thomas Mangelsdorf, M.D. on May 24, 2005, for a psychiatric evaluation. (Tr. 384-88). Dr. Mangelsdorf diagnosed plaintiff with OCD,[11] ADD,[12] a learning disability, and fibromyalgia. (Tr. 388).

Plaintiff saw Dr. Boero for a follow-up regarding his chronic insomnia and pain syndrome on

---

[11]Obsessive-compulsive disorder ("OCD") is a type of anxiety disorder, the essential features of which include recurrent obsessions, persistent intrusive ideas, thoughts, impulses or images, or compulsions sufficiently severe to cause marked distress, be time-consuming, or significantly interfere with the person's normal routine, occupational functioning, or usual social activities or relationship with others. Stedman's at 570.

[12]Attention deficit disorder ("ADD") is a disorder of attention, organization and impulse control appearing in childhood and often persisting to adulthood. Stedman's at 568.

June 13, 2005. (Tr. 655-56). Plaintiff reported no improvement of his symptoms since his last visit. (Tr. 655). Plaintiff indicated that he was not taking Elavil. (Id.). Dr. Boero's impression was history of chronic insomnia and pain. (Id.). Dr. Boero noted that the cause of plaintiff's frequent arousals from sleep was not identified during an all-night polysonogram, although a sleep latency test showed evidence of severe sleepiness with no REM sleep detected. (Tr. 656). Plaintiff indicated that he wanted to obtain a second opinion and requested that his records be released. (Id.).

Dr. Das completed a Physical Medical Source Statement on June 14, 2005, in which he indicated that plaintiff's diagnosis was "currently unknown," and that a work-up was in progress. (Tr. 358). Dr. Das expressed the opinion that in an eight-hour workday, plaintiff was capable of sitting for six hours, standing for fifteen minutes, walking less than fifteen minutes, occasionally reach above his head, occasionally stoop, and lift and carry any amount of weight somewhere between "never" and "occasionally." (Tr. 358-59). Dr. Das indicated that plaintiff would become fatigued after fifteen minutes of manipulating objects with either hand and noted that he would stumble when walking for more than fifteen minutes. (Tr. 359-60). Dr. Das stated that plaintiff suffered from a lack of understanding when tired. (Tr. 359). Dr. Das noted that plaintiff's pain would last all day on bad days, which occurred four days a week. (Tr. 360). Dr. Das stated that plaintiff requires a cane or other assistive device when he is severely fatigued. (Tr. 361). He indicated that plaintiff would need to lie down or take a nap during the workday. (Id.). He stated that plaintiff would need to take a break every five minutes for the first half-hour to two hours and then he would be unable to work due to pain and weakness. (Id.).

Plaintiff presented to Michael Bavlsik, M.D. on July 7, 2005, with complaints of profound fatigue, difficulty getting motivated, a few myalgias, and stiffness that began ten months prior. (Tr.

379). Dr. Bavlsik's impression was symptoms highly suggestive of a fibromyalgia-type illness. (Id.). Dr. Bavlsik noted that the only treatments helpful for fibromyalgia are antidepressants and physical therapy. (Tr. 380). Dr. Bavlsik prescribed Paxil[13] and referred plaintiff to physical therapy. (Id.).

Plaintiff attended physical therapy from July 21, 2005 through September 8, 2005, and from January 13, 2006 through February 16, 2006. (Tr. 362-70, 530-37, 661-94).

Plaintiff saw Dr. Bavlsik on July 28, 2005, at which time Dr. Bavlsik diagnosed plaintiff with fibromyalgia. (Tr. 382). Dr. Bavlsik increased plaintiff's dosage of Paxil, recommended that he continue physical therapy. (Id.).

In a letter to Dr. Bavlsik dated July 28, 2005, Dr. Xu stated that plaintiff had undergone extensive neuromuscular evaluation and neurology evaluation. (Tr. 413). Dr. Xu stated that plaintiff underwent a muscle biopsy the previous month and the pathology report revealed no evidence of myopathy, but nonspecific increased lipid in the cells, otherwise normal study of the muscles. (Id.). He stated that the sleep study revealed normal overnight polysomnogram and abnormal sleep latency study but no evidence of narcolepsy. (Id.). Dr. Xu stated that examinations and testing has revealed "no explanation what-so-ever to explain his chief complaints." (Id.). Dr. Xu noted that he was discharging plaintiff from his clinic and was to follow-up with a sleep clinic and with a psychiatrist to manage his "possible depression." (Id.).

Plaintiff presented to the emergency room at Barnes-Jewish Hospital on July 31, 2005, with complaints of dizziness. (Tr. 390-400). Plaintiff was diagnosed with vertigo. (Tr. 397).

Plaintiff presented to the emergency room at Barnes-Jewish Hospital on August 23, 2005,

---

[13]Paxil is an antidepressant indicated for the treatment of major depressive disorder, obsessive compulsive disorder, and panic disorder. See PDR at 1535-36.

with complaints of nausea, vomiting, and diarrhea.  (Tr. 451-59).  Plaintiff was diagnosed with gastroenteritis.[14]  (Tr. 458).

Plaintiff saw Dr. Bavlsik on September 29, 2005, at which time he reported that he still experienced dizziness, vomiting, and fatigue, but was not depressed.  (Tr. 404).  Dr. Bavlsik diagnosed plaintiff with fatigue and fibromyalgia.  (Tr. 410).  He stated that he had no further treatment options for plaintiff and recommended that plaintiff obtain a second opinion.  (Id.).

Plaintiff saw Dr. Bavlsik on December 16, 2005, at which time Dr. Bavlsik noted that plaintiff was overall better and that he had increased energy.  (Tr. 612).  Dr. Bavlsik diagnosed plaintiff with fibromyalgia and continued him on Paxil and recommended that he continue physical therapy.  (Tr. 613).

Plaintiff presented to otolaryngologist Joel A. Goebel, M.D. on January 17, 2006, with complaints of dizziness.  (Tr. 625).  Plaintiff's physical examination was normal.  (Id.).  Dr. Goebel's assessment was migraine-associated dizziness.  (Id.).  He prescribed Nortriptyline.[15]  (Id.).

Plaintiff saw Dr. Bavlsik on March 17, 2006, at which time he noted that plaintiff's physical therapy was "going well."  (Tr. 620).  He continued plaintiff on Paxil.  (Id.).

On June 16, 2006, plaintiff reported that he was "20% better than when this started."  (Tr. 696).  Dr. Bavlsik noted that plaintiff walked several blocks every day and did push-ups, and that his concentration was better.  (Id.).  Dr. Bavlsik decreased plaintiff's dosage of Paxil.  (Id.).

On September 15, 2006, Dr. Bavlsik noted that plaintiff's aches and pains were the same but

---

[14]Inflammation of the mucous membrane of both the stomach and intestine.  Stedman's at 791.

[15]Nortriptyline is an antidepressant indicated for the treatment of depression.  See WebMD, http://www.webmd.com/drugs (last visited July 8, 2011).

his energy level was "good," and "better." (Tr. 699). Dr. Bavlsik discontinued the Paxil and started plaintiff on Cymbalta. (Tr. 700).

Plaintiff saw Georgia Jones, M.D. for a psychiatric examination at the request of the state agency on March 6, 2007. (Tr. 709-12). Plaintiff reported that he was not seeing a psychiatrist at that time and that he had undergone a psychiatric evaluation almost one year prior. (Tr. 709). Dr. Jones noted that plaintiff "frequently lost his way in the conversation," and often repeated himself. (Tr. 710). She stated that there was "clearly psychomotor retardation present." (Id.). Dr. Jones stated that plaintiff appeared to be in pain, fidgeting and squirming. (Id.). Plaintiff reported that he lived with three roommates and that he helped with chores as much as possible. (Tr. 711). Plaintiff indicated that he interacted with his girlfriend, friends, and church community. (Id.). Plaintiff took care of his own personal hygiene. (Tr. 712). Dr. Jones found that plaintiff's concentration, persistence and pace was clearly diminished, as evidenced both by his report and his performance throughout the exam. (Id.). Dr. Jones diagnosed plaintiff with depressive disorder not otherwise specified, most likely secondary to major medical illness; and assessed a GAF[16] score of 60.[17] (Id.).

On April 6, 2007, plaintiff reported to Dr. Bavlsik that he had experienced a "rough" three months, with increased exhaustion and pain and erratic sleep. (Tr. 701). Plaintiff reported that he was not taking classes that semester and that he spent all his time planning his wedding. (Id.).

---

[16]The Global Assessment of Functioning Scale (GAF) is a psychological assessment tool wherein an examiner is to "[c]onsider psychological, social, and occupational functioning on a hypothetical continuum of mental health-illness" which does "not include impairment in functioning due to physical (or environmental) limitations." Diagnostic and Statistical Manual of Mental Disorders (DSM-IV), 32 (4th Ed. 1994).

[17]A GAF score of 51-60 denotes "[m]oderate symptoms (e.g., flat affect and circumstantial speech, occasional panic attacks) OR moderate difficulty in social, occupational, or school functioning (e.g., few friends, conflicts with peers or co-workers)." DSM-IV at 32.

On November 7, 2007, plaintiff reported to Dr. Bavlsik that his fibromyalgia was better but that he was tired because of his wedding. (Tr. 705).

## C.    Other Evidence

On November 28, 2005, Jerram Barrs, Professor of Christian Studies & Contemporary Culture at the Frans A. Schaeffer Institute of Covenant Theological Seminary, wrote a letter on behalf of plaintiff. (Tr. 484). Mr. Barrs stated that he had been plaintiff's professor for several classes and knew plaintiff well. (Id.). Mr. Barrs described plaintiff as honest, faithful, and kind. (Id.). He stated that he had "no doubt whatsoever that he is genuinely seriously ill." (Id.). Mr. Barr stated that, as a pastor for more than twenty years, he has had the opportunity to get to know every kind of human being and to observe every possible sort of deception. (Id.). He stated that plaintiff is "most certainly not trying to deceive anyone about his health." (Id.). Mr. Barr continued, "[h]e is not lazy and he is most certainly not malingering." (Id.).


## The ALJ's Determination

The ALJ made the following findings:

1.    The claimant met the special earnings requirements of the Act as of November 15, 2004, the alleged onset of disability, and continues to meet them through the date of this decision.

2.    The claimant has not engaged in substantial gainful activity since November 15, 2004.

3.    The claimant has the following impairments: possible fibromyalgia controlled by medication, and a mild untreated depressive disorder related to physical complaints.

4.    The claimant's allegation and that of a recent employer of impairments, either singly or in combination, producing symptoms and limitations of sufficient severity to prevent the performance of all sustained work activity is not credible,

for the reasons set out in the body of this decision.

5.      The claimant has only slight abnormalities that do not significantly affect the performance of any basic work-related activities. Therefore, he does not have a "severe" impairment as defined in 20 CFR 404.1521 and 416.921.

6.      The claimant was not under a "disability," as defined in the Social Security Act, at any time through the date of this decision (20 CFR 404.1520(c) and 416.920(c)).

(Tr. 20).

The ALJ's final decision reads as follows:

It is the decision of the Administrative Law Judge that, based upon the applications filed on February 21, 2006, the claimant is not entitled to a period of disability or to disability insurance benefits under Sections 216(I) and 223, respectively, of the Social Security Act; and is not eligible for supplemental security income under Sections 1602 and 1614(a)(3)(A) of the Act.

(Tr. 20).

## Discussion

### A.    Standard of Review

Judicial review of a decision to deny Social Security benefits is limited and deferential to the agency. See Ostronski v. Chater, 94 F.3d 413, 416 (8th Cir. 1996). The decision of the SSA will be affirmed if substantial evidence in the record as a whole supports it. See Roberts v. Apfel, 222 F.3d 466, 468 (8th Cir. 2000). Substantial evidence is less than a preponderance, but enough that a reasonable mind might accept it as adequate to support a conclusion. See Kelley v. Callahan, 133 F.3d 583, 587 (8th Cir. 1998). If, after review, it is possible to draw two inconsistent positions from the evidence and one of those positions represents the Commissioner's findings, the denial of benefits must be upheld. See Robinson v. Sullivan, 956 F.2d 836, 838 (8th Cir. 1992). The reviewing court, however, must consider both evidence that supports and evidence that detracts from the Commissioner's decision. See Johnson v. Chater, 87 F.3d 1015,

1017 (8th Cir. 1996) (citing Woolf v. Shalala, 3 F.3d 1210, 1213 (8th Cir. 1993)).  "[T]he court must also take into consideration the weight of the evidence in the record and apply a balancing test to evidence which is contrary."  Burress v. Apfel, 141 F.3d 875, 878 (8th Cir. 1998).  The analysis required has been described as a "searching inquiry."  Id.

## B.      The Determination of Disability

The Social Security Act defines disability as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or has lasted or can be expected to last for a continuous period of not less than 12 months."  42 U.S.C. § 416 (I) (1) (a); 42 U.S.C. § 423 (d) (1) (a).  The claimant has the burden of proving that s/he has a disabling impairment.  See Ingram v. Chater, 107 F.3d 598, 601 (8th Cir. 1997).

The SSA Commissioner has established a five-step process for determining whether a person is disabled.  See 20 C.F.R. §§ 404.1520, 416.920; Bowen v. Yuckert, 482 U.S. 137, 141-42, 107 S. Ct. 2287, 2291, 96 L. Ed. 2d. 119 (1987); Fines v. Apfel, 149 F.3d 893, 894-895 (8th Cir. 1998).  First, it is determined whether the claimant is currently engaged in "substantial gainful employment."  If the claimant is, disability benefits must be denied.  See 20 C.F.R. §§ 404.1520, 416.920 (b).  Step two requires a determination of whether the claimant suffers from a medically severe impairment or combination of impairments.  See 20 C.F.R §§ 404.1520 (c)), 416.920 (c)).  To qualify as severe, the impairment must significantly limit the claimant's mental or physical ability to do "basic work activities."  Id.  Age, education and work experience of a claimant are not considered in making the "severity" determination.  See id.

If the impairment is severe, the next issue is whether the impairment is equivalent to one of

the listed impairments that the Commissioner accepts as sufficiently severe to preclude substantial gainful employment. See 20 C.F.R. §§ 404.1520 (d), 416.920 (d). This listing is found in Appendix One to 20 C.F.R. 404. 20 C.F.R. pt. 404, subpt. P, App. 1. If the impairment meets or equals one of the listed impairments, the claimant is conclusively presumed to be impaired. See 20 C.F.R. §§ 404.1520 (d), 416.920 (d). If it does not, however, the evaluation proceeds to the next step which inquires into whether the impairment prevents the claimant from performing his or her past work. See 20 C.F.R. § 404.1520 (e), 416.920 (e). If the claimant is able to perform the previous work, in consideration of the claimant's residual functional capacity (RFC) and the physical and mental demands of the past work, the claimant is not disabled. See id. If the claimant cannot perform his or her previous work, the final step involves a determination of whether the claimant is able to perform other work in the national economy taking into consideration the claimant's residual functional capacity, age, education and work experience. See 20 C.F.R. §§ 404.1520 (f), 416.920 (f). The claimant is entitled to disability benefits only if s/he is not able to perform any other work. See id. Throughout this process, the burden remains upon the claimant until s/he adequately demonstrates an inability to perform previous work, at which time the burden shifts to the Commissioner to demonstrate the claimant's ability to perform other work. See Beckley v. Apfel, 152 F.3d 1056, 1059 (8th Cir. 1998).

The Commissioner has supplemented this five-step process for the evaluation of claimants with mental impairments. See 20 C.F.R. §§ 404.1520a (a), 416.920a (a). A special procedure must be followed at each level of administrative review. See id. Previously, a standard document entitled "Psychiatric Review Technique Form" (PRTF), which documented application of this special procedure, had to be completed at each level and a copy had to be attached to the ALJ's

decision, although this is no longer required. See 20 C.F.R. §§ 404.1520a (d), (d) (2), (e), 416.920a (d), (d) (2), (e). Application of the special procedures required is now documented in the decision of the ALJ or Appeals Council. See 20 C.F.R. §§ 404.1520a (e), 416.920a (e).

The evaluation process for mental impairments is set forth in 20 C.F.R. §§ 404.1520a, 416.920a. The first step requires the Commissioner to "record the pertinent signs, symptoms, findings, functional limitations, and effects of treatment" in the case record to assist in the determination of whether a mental impairment exists. See 20 C.F.R. §§ 404.1520a (b) (1), 416.920a (b) (1). If it is determined that a mental impairment exists, the Commissioner must indicate whether medical findings "especially relevant to the ability to work are present or absent." 20 C.F.R. §§ 404.1520a (b) (2), 416.920a (b) (2). The Commissioner must then rate the degree of functional loss resulting from the impairments in four areas deemed essential to work: activities of daily living, social functioning, concentration, and persistence or pace. See 20 C.F.R. §§ 404.1520a (b) (3), 416.920a (b) (3). Functional loss is rated on a scale that ranges from no limitation to a level of severity which is incompatible with the ability to perform work-related activities. See id. Next, the Commissioner must determine the severity of the impairment based on those ratings. See 20 C.F.R. §§ 404.1520a (c), 416.920a (c).

If the impairment is severe, the Commissioner must determine if it meets or equals a listed mental disorder. See 20 C.F.R. §§ 404.1520a(c)(2), 416.920a(c)(2). This is completed by comparing the presence of medical findings and the rating of functional loss against the paragraph A and B criteria of the Listing of the appropriate mental disorders. See id. If there is a severe impairment but the impairment does not meet or equal the listings, then the Commissioner must prepare a residual functional capacity assessment. See 20 C.F.R. §§ 404.1520a (c)(3), 416.920a

(c)(3).

D.     **Plaintiff's Claims**

Plaintiff argues that the ALJ erred in finding that plaintiff did not have a severe impairment and in terminating the analysis at Step Two. Plaintiff also argues that the ALJ erred in weighing the opinion of treating physician Dr. Das. The undersigned will discuss plaintiff's claims in turn.

The ALJ determined that plaintiff did not suffer from any severe impairments or combination of impairments that were of such severity as to limit his ability to perform basic work activities. He concluded the medical evidence establishes only slight abnormalities that would have no more than a minimal effect on his ability to work, ending the inquiry at Step Two of the five-step evaluation process. (Tr. 17).

At Step Two of the evaluation process, the ALJ must determine if a claimant suffers from a severe impairment. Kirby v. Astrue, 500 F.3d 705, 707 (8th Cir. 2007). The claimant bears the burden of proving his impairment or combination of impairments is severe, but the burden is not a heavy one, and any doubt concerning whether the showing has been made must be resolved in favor of the claimant. Id.; Dewald v. Astrue, 590 F. Supp.2d 1184, 1200 (D.S.D. 2008). "Severity is not an onerous requirement for the claimant to meet, but it is also not a toothless standard. . . ." Kirby, 500 F.3d at 707. See also Germany-Johnson v. Comm'r of Soc. Sec., 313 F. App'x 771, 774 (6th Cir. 2008) (per curiam) (Step-Two severity review is used primarily to screen out totally groundless claims). Social Security Ruling 85-28 states:

> Great care should be exercised in applying the not severe impairment concept. If an adjudicator is unable to determine clearly the effect of an impairment or combination of impairments on the individual's ability to do basic work activities, the sequential evaluation process should not end with the not severe evaluation step. Rather, it should be continued.... [S]equential evaluation requires that the adjudicator evaluate the individual's ability to do past work, or to do other work based on the consideration of age,

education, and prior work experience.

Social Security Ruling 85-28, quoted in <u>Bowen v. Yuckert</u>, 482 U.S. 137, 158, (O'Connor, J., concurring). <u>See</u> <u>also</u> <u>Gilbert v. Apfel</u>, 175 F.3d 602, 604-05 (8th Cir. 1999)(same).

In applying the second step of the sequential evaluation process, "[o]nly those claimants with slight abnormalities that do not significantly limit any 'basic work activity' can be denied benefits without undertaking" the subsequent steps of the evaluation process. <u>Brown v. Bowen</u>, 827 F.2d 311, 312 (8th Cir. 1987) (quoting <u>Bowen v. Yuckert</u>, 482 U.S. 137, 158, (1987) (O'Connor, J., concurring)). <u>See</u> <u>also</u> <u>Kirby</u>, 500 F.3d at 707 (an impairment is not severe if it amounts to only a "slight abnormality" and does not significantly limit the claimant's physical or mental ability to do basic work activities); 20 C.F.R. § 404.1521(a) (same).

Basic work activities concern the abilities and aptitudes necessary to perform most jobs. 20 C.F.R. § 404.1521(b). Examples of basic work activities include: (1) physical functions such as walking, standing, sitting, lifting, pushing, pulling, reaching, carrying, or handling; (2) capacities for seeing, hearing, and speaking; (3) understanding, carrying out, and remembering simple instructions; (4) use of judgment; (5) responding appropriately to supervision, co-workers, and usual work situations; and (6) dealing with changes in a routine work setting. <u>Id.</u> The sequential evaluation process terminates at Step Two if the impairment has no more than a <u>minimal</u> effect on the claimant's ability to work. <u>Kirby</u>, 500 F.3d at 707.

The ALJ first discussed plaintiff's physical complaints. The ALJ stated that it is not clear what impairment, if any, plaintiff really has. (Tr. 17). The ALJ noted that plaintiff does not have all of the necessary trigger point findings for fibromyalgia. (<u>Id.</u>). The ALJ continued that, even if plaintiff did have the necessary trigger point findings, plaintiff's doctors have recommended

physical exercise, not inactivity, as a treatment. (Id.). Finally, the ALJ noted that plaintiff's complaints of nausea, vomiting, and dizziness only occurred a few times in the prior two years. (Id.).

The undersigned finds that substantial evidence supports the ALJ's finding that plaintiff does not suffer from a severe physical impairment. Plaintiff does not have a definite medical diagnosis for his physical complaints. Plaintiff testified that he suffers from fibromyalgia, and many of his physicians have mentioned fibromyalgia as a possible diagnosis. Fibromyalgia has the potential to be disabling. Forehand v. Barnhart, 364 F.3d 984, 987 (8th Cir. 2004). The Secretary has noted that fibromyalgia is medically determinable and that the presence of certain symptoms, including the presence of focal trigger points, may be sufficient to establish the diagnosis. See Social Security Ruling 99-2p; Brosnahan v. Barnhart, 336 F.3d 671, 678 (8th Cir. 2003) ('objective medical evidence of fibromyalgia [includes] consistent trigger-point findings."). On March 15, 2005, it was found that plaintiff did not have the requisite trigger points to establish a diagnosis of fibromyalgia. (Tr. 317). Although Dr. Bavlsik continued to assess plaintiff with fibromyalgia, there is no indication in the record that plaintiff ever had the required trigger point findings to establish a diagnosis of fibromyalgia. As such, the ALJ correctly found that a diagnosis of fibromyalgia has not been established.

The ALJ's finding that plaintiff does not suffer from a severe physical impairment is supported by the evidence of record. Plaintiff consistently complained of fatigue and pain. Dr. Xu diagnosed plaintiff with "subjective complaints without objective abnormal findings," after conducting extensive testing. (Tr. 329, 415). Dr. Xu recommended a sleep study, which was normal other than an abnormal sleep latency. (Tr. 413). Dr. Xu stated that examinations and

- 30 -

testing revealed "no explanation what-so-ever to explain his chief complaints." (Id.). Although Dr. Bavlsik consistently assessed fibromyalgia, he noted no physical findings to support this diagnosis. On December 16, 2005, Dr. Bavlsik noted that plaintiff was overall better and that he had increased energy. (Tr. 612). On June 15, 2006, plaintiff reported that he was feeling better and that he walked several blocks every day and did push-ups. (Tr. 696). On September 15, 2006, Dr. Bavlsik noted that plaintiff's energy level was good. (Tr. 699). Plaintiff reported that he was exhausted in April 2007 and in November 2007, but only due to planning his wedding. (Tr. 701, 705). The record supports the ALJ's finding that plaintiff suffers from only slight abnormalities that would have no more than a minimal effect on his ability to work.

Plaintiff relies primarily on the opinion of Dr. Das in support of his argument that his physical impairments are severe. Dr. Das completed a Physical Medical Source Statement on June 14, 2005, in which he expressed the opinion that plaintiff had significant work-related limitations, including a need to lie down or take a nap during the workday, and a need to take a break every five minutes for the first half-hour to two hours, after which he would be unable to work due to pain and weakness. (Tr. 358). Plaintiff contends that the ALJ erred in weighing the opinion of Dr. Das, a treating physician.

In analyzing medical evidence, "[i]t is the ALJ's function to resolve conflicts among 'the various treating and examining physicians.'" Johnson v. Apfel, 240 F.3d 1145, 1148 (8th Cir. 2001) (quoting Bentley v. Shalala, 52 F.3d 784, 787 (8th Cir. 1995)). "Ordinarily, a treating physician's opinion should be given substantial weight." Rhodes v. Apfel, 40 F. Supp.2d 1108, 1119 (E.D. Mo. 1999) (quoting Metz v. Halala, 49 F.3d 374, 377 (8th Cir. 1995)). Further, a treating physician's opinion will typically be given controlling weight when the opinion is "well-

supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in [the] record." Prosch v. Apfel, 201 F.3d 1010, 1012-1013 (8th Cir. 2000) (quoting 20 C.F.R. § 404.1527 (d)(2) (bracketed material in original). Such opinions, however, do "not automatically control, since the record must be evaluated as a whole." Id. at 1013 (quoting Bentley, 52 F.3d at 785-786). Opinions of treating physicians may be discounted or disregarded where other "medical assessments 'are supported by better or more thorough medical evidence.'" Id. (quoting Rogers v. Chater, 118 F.3d 600, 602 (8th Cir. 1997)).

In this case, as the ALJ properly noted, Dr. Das indicated that plaintiff's diagnosis was "currently unknown," and that a work-up was in progress. (Id.). Dr. Das' findings were based solely on plaintiff's subjective complaints rather than any objective findings. Further, as discussed above, the remainder of the medical record did not support the presence of a severe physical impairment. As such, the ALJ was not required to give any weight to Dr. Das' opinion.

The ALJ also found that plaintiff did not suffer from a severe mental impairment. The ALJ noted that Dr. Mangelsdorf diagnosed obsessive-compulsive disorder and attention deficit disorder base on a one-time examination in May 2005, and that Dr. Jones found that plaintiff was "mildly depressed" in March 2007. (Tr. 18). The ALJ stated that plaintiff's basic abilities to think, understand, communicate, concentrate, get along with other people, and handle normal work stress have never been significantly impaired on any documented long-term basis. (Id.). The ALJ stated that plaintiff has never been referred for formal treatment from a psychiatrist, psychologist, or other mental health professional. (Id.). Finally, the ALJ noted that plaintiff displayed no obvious signs of a mental disturbance at the hearing. (Id.).

The undersigned finds that the ALJ's determination that plaintiff does not suffer from a

severe mental impairment is not supported by substantial evidence. First, the ALJ mischaracterized Dr. Jones' findings in stating that Dr. Jones found that plaintiff was "mildly depressed." (Tr. 18). Dr. Jones never stated that plaintiff was only mildly depressed. As noted above, Dr. Jones diagnosed plaintiff with depressive disorder and assessed a GAF score of 60. A GAF score of 60 is indicative of moderate symptoms, including moderate difficulty in social, occupational, or school functioning.[18] Dr. Jones' findings that psychomotor retardation was clearly present and that plaintiff's concentration, persistence and pace was clearly diminished lend support to this GAF score. These findings do not support the ALJ's characterization of "mild" depression. Rather, Dr. Jones' report reveals the presence of a mental impairment that would have more than a minimal effect on plaintiff's ability to work.

The ALJ's statement that plaintiff has never been referred for psychiatric treatment is also inaccurate. In May 2005, Dr. Xu noted the presence of "psychiatric features" and suggested a psychiatric evaluation. (Tr. 415-16). Plaintiff saw Dr. Mangelsdorf for a psychiatric evaluation on May 24, 2005, at which time he was diagnosed with obsessive-compulsive disorder and attention deficit disorder. (Tr. 388). On July 28, 2005, Dr. Xu discharged plaintiff from his clinic and recommended that he follow-up with a psychiatrist to manage his possible depression. (Tr. 413).

In sum, the ALJ's determination that plaintiff does not suffer from a severe mental impairment is not supported by substantial evidence. The ALJ mischaracterized the evidence in finding that plaintiff suffered from only mild depression that would have no more than a minimal impact on his ability to work.

---

[18]See DSM-IV at 32.

Defendant argues in the alternative that, even if the ALJ erred at Step Two, the ALJ properly formulated plaintiff's residual functional capacity and found that he could perform other jobs existing in significant numbers in the national economy. This argument is based on the following statement by the ALJ:

> Even if the undersigned were to give a very extensive benefit of the doubt to the claimant and find him restricted to sedentary work, such that he could not do any of his past jobs, and find that he had additional restrictions of being allowed to alternate sitting and standing as needed, and had to be limited to simple, repetitive tasks, the vocational expert testified that he could still do any of a total of some 21,000 unskilled jobs in the St. Louis area as a receptionist, telemarketer, cashier, clerk, and security guard. This would, in the alternative, be an unfavorable determination at Step 5 of the sequential evaluation process found at 20 CFR 404.1520(g) and 416.920(g).

(Tr. 19).

Plaintiff argues that this discussion by the ALJ is not a "finding," and that the ALJ provided no support for the residual functional capacity that he cited. The undersigned agrees. The ALJ did not provide this residual functional capacity in his findings but, rather, ended his analysis at Step Two. Further, the ALJ provided no support for the residual functional capacity he formulated.

Accordingly, the undersigned recommends that this matter be reversed and remanded to the ALJ in order for the ALJ to proceed with the five-step process to determine if plaintiff's severe mental impairment is disabling.

## RECOMMENDATION

**IT IS HEREBY RECOMMENDED** that pursuant to sentence four of 42 U.S.C. § 405 (g), the decision of the Commissioner be **reversed** and this case be **remanded** to the Commissioner for further proceedings consistent with this Report and Recommendation.

The parties are advised that they have fourteen (14) days in which to file written objections to this Report and Recommendation pursuant to 28 U.S.C. § 636 (b) (1), unless an extension of time for good cause is obtained, and that failure to file timely objections may result in a waiver of the right to appeal questions of fact. See Thompson v. Nix, 897 F.2d 356 (8th Cir. 1990).

Dated this __17th__ day of August, 2011.

LEWIS M. BLANTON
UNITED STATES MAGISTRATE JUDGE